**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ASHFORD PERKINS, | CASE NO. 1:22-CV-01654-AMK |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff ("Plaintiff" or "Mr. Perkins") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Child's Insurance Benefits[1] ("CIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  (ECF Doc. 15.)

For the reasons set forth below, the Court **VACATES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion and order.  On remand, the ALJ shall clearly and accurately articulate her findings as to the persuasiveness of the consultative opinions of Thomas Lehmann, Ph.D., and James N. Spindler, M.S., and other relevant medical opinions, specifically acknowledging and accurately characterizing any

---

[1] Under the authority of the Social Security Act, the Social Security Administration has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is 18 years old or older and has a disability that began before attaining age 22 (20 CFR 404.350(a)(5)).

cognitive testing considered and appropriately explaining how she considered both the supportability and the consistency of the opinions. The ALJ should also ensure that her decision complies with the governing regulatory framework and builds an accurate and logical bridge between the evidence and result.

## I.    Procedural History

Mr. Perkins protectively filed the current application for SSI benefits on March 13, 2018, alleging his date of birth in 1987 as the onset date. He protectively filed for CIB on April 10, 2018, alleging disability beginning the day he turned eighteen in 2005, when he became eligible for CIB. (Tr. 15.) He alleged disability due to ADHD, bipolar, anger, and anxiety. (Tr. 468.)

Mr. Perkins's application was denied at the initial level (Tr. 213-15, 216-18) and upon reconsideration (Tr. 224-30, 231-35). He requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 236-38). The hearing was held on November 1, 2019 ("2019 Hearing"). (Tr. 79.) On November 29, 2019, the ALJ issued a decision finding Mr. Perkins had not been under a disability within the meaning of the Social Security Act from his date of birth in 1987 through the date of the decision ("2019 ALJ Decision"). (Tr. 182-204.)

On October 1, 2020, the Appeals Council remanded the 2019 ALJ Decision for resolution of three issues:

(1) The Administrative Law Judge found the claimant not disabled from July 13, 1987 through the date of the decision (Finding 11). However, the record indicates the claimant was disabled under a Title XVI application beginning March 1, 2000 (Exhibit 10A) and ceasing July 2017 as per our records. The claimant was also disabled under a Title 2 application for child disability benefits beginning June 30, 2005 (Exhibit 11A), ceasing September 11, 2017. These prior claims were filed under the same title, and involved the same party, material facts, and issues, which was finally decided on the merits. The Administrative Law Judge did not make any findings regarding res judicata or reopening, and the current decision invades the prior period by finding the claimant not disabled since July 13, 1987, and contradicts the prior determinations of disability (HALLEX I-2-9-1). Upon remand, the Administrative Law Judge must determine whether the claimant has satisfied

good cause for reopening the prior favorable determinations (HALLEX I-2-9-40). Further evaluation of administrative res judicata and whether there is any basis to reopen the final adjudication on the claimant's prior applications is necessary.

(2) While the Administrative Law Judge found the claimant not disabled from July 13, 1987, entitlement to childhood disability benefits begins at age 18 (20 CFR 404.351 and 404.352). The claimant was born on July 13, 1987 and attained age 18 on July 12, 2005. The hearing decision therefore makes a finding regarding disability outside of the claimant's period at issue for childhood disability benefits. Further consideration is necessary.

(3) The decision does not fully evaluate the claimant's symptoms, nor their impact on the residual functional capacity, as required by 20 CFR 404.1529 and 416.929 and Social Security Ruling 16-3p. The Administrative Law Judge found the claimant's statements concerning the intensity, persistence and limiting effects of his alleged symptoms were inconsistent because the level of limitation alleged was inconsistent with the objective findings (Decision, page 11). However, the decision does not contain adequate rationale in support of this conclusion as it does not weigh relevant factors . . . .

(Tr. 207-08.)

To resolve the above-cited issues, the Appeals Council directed the ALJ to do the following on remand:

- Consider whether administrative res judicata is applicable to any portion of the period at issue and whether reopening is applicable (HALLEX I-2-9-1 and I-2-9-40).

- During the relevant period at issue, follow the sequential evaluation process and make appropriate findings at each step of the evaluation process (20 CFR 404.1520 and 416.920).

- Further evaluate the claimant's symptoms in accordance with 20 CFR 404.1529 and 416.929 and Social Security Ruling 16-3p.

(Tr. 208.)

The ALJ held a second hearing on April 7, 2021 ("2021 Hearing"). (Tr. 34.) She issued a decision on May 11, 2021 ("2021 ALJ Decision"), finding that Mr. Perkins was not under a disability within the meaning of the Social Security Act from his eighteenth birthday in 2005 through the date of the decision. (Tr. 27.) The Appeals Council affirmed the decision (Tr. 1-6),

making the 2021 ALJ Decision the final decision of the Commissioner.  Mr. Perkins then filed

the pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 10, 11, 12).

## II.     Evidence

**A.    Personal, Educational, and Vocational Evidence**

Mr. Perkins was born in 1987 and alleged disability onset at his birth, making him a

younger individual under Social Security regulations on the alleged onset date.  (Tr. 20.)  At the

time of the 2021 Hearing, he lived alone in an apartment obtained for him by Catholic Services,

after having lived in a shelter for several months.  (Tr. 24, 750.)

Mr. Perkins has a high school education.  (Tr. 25.)  He received special education starting

in first grade (Tr. 701) and graduated high school in a learning disability program (Tr. 469).  Mr.

Perkins received his K-12 education in Wisconsin.  (Tr. 516-595, 701, 705.)  During eighth

grade, Mr. Perkins attended Sholes Middle School and had an Individualized Education Plan

("IEP").  (Tr. 519-574.)  The IEP was based on the following established disabilities: cognitive

disability; emotional behavioral disability; and specific learning disability.  (Tr. 520.)  Between

September 18, 2000, and May 2, 2001, Sholes Middle School records also indicate Mr. Perkins

was cited at least fifteen times and received consequences such as calls and letters to parent,

detention, multiple suspensions of varying severity (from in-school suspensions up to 3-day out-

of-school suspensions), and police action referrals. (Tr. 538, 546, 548, and 574.)

Mr. Perkins received SSI benefits from 2000 until 2017, and received CIB from 2005 to

2017.  (Tr. 180-81, 207.)  During this time, Mr. Perkins lived outside of Ohio.  (*See* Tr. 180-81.)

The primary diagnosis for his disability status was: mental retardation (Listing 12.05D) for SSI;

mild mental retardation (Listing 12.05C) for CIB.  (Tr. 180-81.)  Benefit payments stopped in

4

2017.  (*See* Tr. 207-08.)  The parties have not identified evidence as to why the benefits stopped, but Mr. Perkins' counsel reported that it happened when Mr. Perkins relocated to Ohio.  (Tr. 84.)

Mr. Perkins has no past relevant work.  (Tr. 25, 187.)  Earnings records reflect no earnings prior to 2019.  (Tr. 463, 464-65.)  Mr. Perkins first worked as a part-time dishwasher at Jackalope Bar and Rotisserie in 2019.  (Tr. 40, 464, 466.)

Mr. Perkins next worked as a dishwasher through Spectrum Vocational Services in 2019. (Tr. 86, 464, 466.)  He was terminated by Spectrum in February 2020, after being cited for not focusing on his work, having angry outbursts, and whistling and making sexual comments towards female staff members.  (Tr. 609.)  His termination letter reflects that he was given three verbal warnings before termination.  (*Id*.)

Mr. Perkins was hired as kitchen help for Wood & Wine in November 2020.  (Tr. 40, 460-61.)  At his 2021 hearing, Mr. Perkins reported working for Wood & Wine until it closed, around March 2021.  (Tr. 49.)  But case management notes indicate Mr. Perkins said he had been laid off due to performance issues, including being slow, in November 2020.  (Tr. 871.) Earnings records do not indicate Mr. Perkins received any earnings in 2021.  (Tr. 463-465.)

**B.    Medical Evidence**

**1.    Relevant Treatment History**

Mr. Perkins attended an initial appointment and psychotherapy with Lisa Brown, MSE, LPC, at the Nord Center on March 2, 2018.  (Tr. 619-25.)  He reported that he had anxiety, depression, and bipolar and wanted counseling and psychiatric services. (Tr. 619.)  Mr. Perkins said that he lived with his mother as a child, but was sent to a foster home from ages seven to eight because of his bad anger issues.  (*Id.*)  He reported anhedonia, fatigue, low self-esteem, worthlessness, and suicidal ideation.  (*Id.*)  He explained that he missed his deceased brother,

who was a role model and whose body Mr. Perkins saw after his suicide.  (Tr. 621.)  Mr. Perkins also reported self-harm with sharp objects or cigarettes to "feel pain and like a release from being depressed," saying he had burned himself with a cigarette about 2.5 months before.  (*Id.*)

On examination, Mr. Perkins was well groomed with average eye contact and demeanor, and clear speech.  (Tr. 623-24.)  He was alert, fully oriented, and cooperative, with logical thought processes.  (*Id.*)  His intelligence was estimated to be average.  (*Id.*)  His mood was mildly depressed, but his affect was full.  (*Id.*)  He demonstrated fair insight but poor judgment.  (*Id.*)  He complained of auditory hallucinations, a history of self-harm, and impaired attention and concentration, but no current suicidal or homicidal ideation, plan, or intent.  (*Id.*)  He was referred for mental health counseling / psychotherapy one to four times monthly and for community psychiatric supportive treatment ("CPST") as needed. (Tr. 625, 626.)

Mr. Perkins attended an initial psychotherapy session with Roseann D. Harper, LSW, PC, on March 7, 2018.  (Tr. 639-40.)  He was oriented and cooperative, with logical thought processes but a depressed mood and flat affect.  (Tr. 639.)  He reported being depressed about living in a shelter after moving to Ohio and wanted help managing his anger.  (*Id.*)

Mr. Perkins attended an initial case management session—therapeutic behavioral services ("TBS")—with Tiffany Schmidt, QMHS, on May 14, 2018.  (Tr. 655-56.)  He reported being able to handle most things on his own, including applying for two apartments and looking for part time work.  (Tr. 655.)  QMHS Schmidt provided information regarding low-income housing and supported employment; she reported that Mr. Perkins was receptive but not engaged.  (*Id.*)

Mr. Perkins attended additional psychotherapy sessions with LSW Harper on March 19, April 25, and May 14 and 21, 2018.  (Tr. 641-48.)  On March 19, he expressed frustration with the lack of progress in filing for entitlements, disability benefits, and housing.  (Tr. 641.)  His

mood was anxious and his affect remained flat.  (*Id.*)  On April 25, his mood was depressed and frustrated, and his affect was flat; LSW Harper also noted that he was somewhat disengaged. (Tr. 643.)  He reported trying to get housing and considering getting income through work, but was afraid it would ruin his approval for disability benefits.  (*Id.*)  LSW Harper made a referral for pharmacological services.  (*Id.*)  On May 14, he was oriented with a full affect and logical thought processes, but was restless and anxious.  (Tr. 645.)  He "seemed 'high' and was restless and focused on his phone"; when asked if he was under the influence, he reported having three cups of coffee.  (*Id.*)  LSW Harper addressed alcohol or other drug ("AOD") issues with Mr. Perkins in light of his behavior during the session, and they also explored coping skills to manage anger and improve functioning.  (*Id.*)  On May 21, Mr. Perkins was oriented and cooperative, with logical thought processes, but had a down, depressed mood and a flat affect. (Tr. 647.)  He appeared subdued, expressed frustration over how slowly he was getting what he needed, and reported an upcoming job interview.  (*Id.*)

Mr. Perkins attended an evaluation and medication management appointment with Julie Stone, PMHNP-BC, on May 21, 2018.  (Tr. 633-35.)  He reported a "long history of anger issues and 'being bipolar,'" with his most recent outburst two weeks prior involving a staff member at the shelter where he was staying.  (Tr. 633.)  He reported being worse as a child, saying his mother put him in a group home because he was difficult to control.  (*Id.*)  He denied delusions, hallucinations, or psychotic symptoms, but reported occasionally feeling like others are calling his name in a crowd.  (*Id.*)  He reported staying in a shelter the past 4-5 months, having lost his disability due to not updating his information.  (*Id.*)  On examination, he was well groomed, alert, and oriented, with intact associations; his speech was clear and his language expressive; his though processes were logical but circumstantial, with no abnormal thought content; his mood

was depressed and anxious, with a neutral affect; his insight, judgment, and fund of knowledge were fair.  (Tr. 633-34.)  NP Stone diagnosed him with bipolar II, depressed-moderate, and post-traumatic stress disorder.  (Tr. 633.)  She prescribed a trial of Seroquel.  (Tr. 634.)

Mr. Perkins returned for psychotherapy with LSW Harper on July 2, 16, and 27, 2018. (Tr. 649-54.)  On July 2, LSW Harper noted that Mr. Perkins had not been keeping up with his appointments and reported no progress with employment or housing.  (Tr. 649.)  His mood was depressed and frustrated, with a flat affect, and blocked, distracted thought processes.  (*Id.*)  He also had not followed through on picking up his medications.  (*Id.*)  He was on the waitlist for supported employment services.  (*Id.*)  LSW Harper reported "no progress" from this visit and that Mr. Perkins was in denial.  (*Id.*)  On July 16, LSW Harper reported good progress, that Mr. Perkins was positive about getting support for housing and work, and that he was using strategies to avoid confrontation.  (Tr. 651-52.)  His mood was appropriate, with full affect, logical and clear thoughts, and busy, focused behavior.  (Tr. 651.)  On July 27, he was quiet and tired looking, with a flat affect, logical and slowed thoughts, and cooperative behavior.  (Tr. 653.)  He reported that he was tired after taking Seroquel the night before.  (*Id.*)  He was applying for jobs, but was not being called for an interview.  (*Id.*)

Mr. Perkins returned for medication management with NP Stone on July 16, 2018.  (Tr. 636-38.)  He reported that he did not start Seroquel after the last visit because of a pharmacy issue, but had started it two weeks prior.  (Tr. 636.)  On Seroquel, his mood felt more even, with less anger and improved sleep.  (*Id.*)  He remained at the shelter and continued to look for a job. (*Id.*)  On examination, he was well groomed, alert, and oriented, with clear speech, expressive language, intact associations, and good memory; his thought processes were logical but circumstantial, with no abnormal thought content; his mood was euthymic and his affect full; his

insight, judgment, and fund of knowledge remained fair.  (Tr. 636-37.)  NP Stone advised Mr.

Perkins to continue counseling and Seroquel and to abstain from marijuana use.  (Tr. 637.)

On August 6, 2018, Mr. Perkins had a case management appointment at Nord Center

with Bailey Brimus, QMHS.  (Tr. 657.) Mr. Perkins reported that he was also working with Tim

Wright at Catholic Services.  (*Id.*)  QMHS Brimus and Mr. Perkins discussed food stamps,

disability, medical insurance.  (*Id.*)  QMHS Brimus observed history of noncompliance with

treatment recommendations.  (*Id.*)

On November 14, 2018, Mr. Perkins completed a mental health diagnostic assessment

with Spencer Keech, LPC, at Catholic Charities-Behavioral Health Department.  (Tr. 739-49.)

Mr. Perkins reported a PTSD diagnosis, depression, constant anxiety, and dyslexia.  (Tr. 739.)

He also reported self-harm, saying "I self [in]flicted, when I feel that I'm not there, it comes to

reality that I hurt myself."  (Tr. 740.)  On examination, Mr. Perkins had fair grooming, average

demeanor, normal speech, and fair insight and judgment; but he also had an anxious mood,

constricted affect, increased motor activity, and circumferential associations.  (Tr. 746-47.)  LPC

Keech observed that he exhibited motor agitation and compromised concentration.  (Tr. 749.)

The treatment recommendation was that Mr. Perkins "would benefit from continuing his

engagement in services at Nord."  (*Id.*)

However, Mr. Perkins was discharged from Nord Center services on November 18, 2018.

(Tr. 688-92.)  His last reported date of contact was September 7, 2018.  (Tr. 689.)  In the

Continuity of Care/Transition Plan, it was noted that Mr. Perkins had not made progress in

obtaining housing or employment, and that he was noncompliant with treatment services.  (*Id.*)

On March 13, 2019, Mr. Perkins was admitted to the Emergency Department of Mercy

Health after his friend called an ambulance.  (Tr. 676.)  He later reported that he had been

holding a butcher's knife to his arm and threatening to kill himself. (Tr. 750.) After the treatment team discussed his case, Mr. Perkins was referred to the Department of Psychiatry and seen by Balaji Saravanan, M.D. (Tr. 676.) Mr. Perkins reported significant history of bipolar and addiction; he used cocaine three days prior but reported not using regularly; he used alcohol occasionally. (*Id.*) He reported not remembering what he was doing when his friend called emergency services, that his dad died two months prior, and that he heard his mom was in the hospital but was not sure whether it was a rumor. (*Id.*) Dr. Saravanan stated that Mr. Perkins was noncompliant, "getting angry and irritable about being locked up here" and was "demanding discharge." (Tr. 676, 678.) Mr. Perkins was discharged about three weeks later, on April 3, 2019. (Tr. 680.) His symptoms were improving (Tr. 683) and his condition was stable (Tr. 680). Dr. Saravanan prescribed Depakote (Tr. 685) and diagnosed Mr. Perkins with depression and substance induced mood disorder (Tr. 684).

Mr. Perkins participated in an intake assessment with Psych & Psych Services on April 4, 2019. (Tr. 732-38.) He was seeking a mental health evaluation for social security. (Tr. 732.) On examination, he was alert, oriented, aware, and cooperative, with moderate judgment, anxious and withdrawn mood, and appropriate affect. (*Id.*) He reported symptoms that included irritability, racing thoughts, anger and control issues, anxiety, and social phobia. (Tr. 735.) On April 24, 2019, he attended a psychotherapy session for treatment planning. (Tr. 731.) His mood was anxious, but other mental status findings were unremarkable. (*Id.*) Recommended interventions included anxiety, anger, and behavioral management, social skills tracing, and problem solving. (*Id.*) No further treatment records involving this provider were identified.

Beginning in August 2019, Mr. Perkins received case management assistance through a social worker at Lorain Mental Health Service—Catholic Charities. (*See* Tr. 759-875.) Mr.

Perkins sought this assistance after his application for disability benefits in Ohio was denied. (Tr. 752.)  His case worker, Tim Wright, LISW, helped him with reading documents, housing rights and responsibilities, money management, acquiring clothes, finding housing, and understanding and filling out paperwork.  (Tr. 759-875.)  Examples include:

- Help with budgeting and money matters. (*See* Tr. 763, 768, 78, 794 (behind in rent) 832, 839, 867, 868, 874, 884, 886 (eviction notice), 890, 892.)

- Support with the disability appeals process, including speaking with Mr. Perkins' attorney.  (*See* Tr. 773-74, 765, 776.)

- Assisting with job applications and employment matters.  (*See* Tr. 792, 798, 805, 814, 821, 822, 824, 826, 830, 836, 838, 840, 844, 851, 854, 856-857, 858, 878. 883, 811-812, 860 (role playing for a job interview).)

- Managing medical appointments.  (*See* Tr. 769, 770.)

- Reading, explaining, and completing documents for Mr. Perkins because he had difficulty reading or understanding the content. (*See* Tr. 771, 778, 782, 790, 806, 809, 824, 842, 844, 851, 862, 869, 878, 878, 888, 894, 904.)

Mr. Perkins saw LISW Wright for case management services on a frequent basis, almost always weekly, through May 2020.  (*See generally* Tr. 759-875.)

On October 22, 2019, Mr. Perkins attended a diagnostic assessment for mental health and substance use with Kayla Thompson, LPC, at Firelands Regional Medical Center—Counseling and Recovery Services.  (Tr. 750-56.)  He was referred by his Catholic Charities case manager, Tim Wright, and Mercy Hospital following his March 2019 hospitalization.  (Tr. 750, 756.)  He reported receiving his medications from his primary care provider "[s]ince being closed from Nord," but his providers wanted to get him connected with a mental health treatment provider. (Tr. 750.)  He was residing in an apartment that Catholic Charities helped him to obtain.  (*Id.*) He had been residing there for a few months, and was recently unemployed due to having a seasonal job.  (*Id.*)  Mr. Perkins reported various traumas, including: a housefire at age 13 for which he was at fault; his brother committing suicide when he was 15 and seeing the body; his

11

father's sudden death; being assaulted with and without a weapon; and a car accident.  (Tr. 751, 756.)  He was cooperative throughout the session, but difficult to follow at times.  (Tr. 756.)  His mental status findings were unremarkable, except for loose, concrete thinking and a depressed mood.  (Tr. 753-54.)  Mr. Perkins did not return for treatment and was therefore discharged on March 19, 2020.  (Tr. 757-58.)

### 2. Opinion Evidence

#### i. Childhood Evaluations

**Brenda L. Bergman, Ph.D. – 1995 evaluation, age 8**

Brenda Bergman, Ph.D., a licensed psychologist in the Human Development Center of Duluth, performed an evaluation of Mr. Perkins based on an informal referral by his school over attention and focus concerns.  (Tr. 701.)   Mr. Perkins was eight years old.  (Tr. 703.)  Dr. Bergman met with Mr. Perkins twice, interviewed his mother, reviewed school records, and performed a Weschler Intelligence Scale for Children (WISC-III) test.  (Tr. 701.)  Mr. Perkins scored in the Mildly Mentally Retarded to Borderline range on the WISC-III.   (Tr. 702.)  Dr. Bergman believed the borderline range was probably more accurate, since Mr. Perkins "refused to try difficult items, for some of which he probably could have earned additional points."  (*Id.*)  Dr. Bergman noted that Mr. Perkins's "spotty cooperation" made it difficult to reach conclusions, but noted that his "wary tension, and the anxiety that underlies it," were strongly evident.  (Tr. 703.)  She also indicated that his history suggested his anxiety was probably related to violence he witnessed.  (*Id.*)  She recommended trauma therapy with a male counselor and psychiatric evaluation to determine if medication would be beneficial.  (*Id.*)

**Daniel Moen, MA – 2000 evaluation, age 12**

Mr. Perkins attended a psychological evaluation for intellectual functioning and possible learning disorders with Daniel Moen, MA, Licensed Psychologist, with St. Luke's Mental Health Services on June 8, 2000.  (Tr. 704-09.)  Mr. Perkins was twelve years old and in sixth grade at the time.  (Tr. 704.)  L.P. Moen interviewed and evaluated Mr. Perkins, administered WISC-III testing, interviewed Mr. Perkins's mother, reviewed treatment notes for then-treating psychiatrist Dr. Egan, and spoke with Mr. Perkins's teacher.  (Tr. 704-09.)  Mr. Perkins's mother reported difficulty following directions, poor concentration, and anger problems.  (Tr. 704.)

On examination, Mr. Perkins was compliant and cooperative, alert and oriented to place and time, and demonstrated intact memory, unremarkable motor activity, and fair judgment.  (Tr. 705.)  However, he had poor eye contact and difficulty expressing himself, with a balanced but somewhat anxious mood.  (*Id.*)  He was functioning in the mild range of mental retardation based on his WISC-III full scale IQ ("FSIQ") score.  (*Id.*)  WISC testing revealed a verbal IQ of 55, a performance IQ of 63, and an FSIQ of 55, all classified as mild mental retardation.  (Tr. 706-09.)  Because Mr. Perkins verbal IQ and performance IQ scores did not differ significantly, L.P. Moen concluded that his FSIQ score was a valid indicator of his general intellectual ability.  (Tr. 707.)

L.P. Moen noted that Mr. Perkins did not return for further testing, and recommended that an adaptive behavioral assessment and achievement testing would be appropriate.  (Tr. 709.)  L.P. Moen also recommended special education services, continuing medication management, and possible family therapy, but noted a concern that evasiveness or guardedness might interfere with psychotherapy.  (*Id.*)

###### ii.    Consultative Examinations

**Thomas Lehmann, Ph.D. – 2006 examination**

On February 15, 2006, Mr. Perkins presented to Thomas Lehmann, Ph.D., of Life-Span Psychological Services for a consultative psychological examination at the request of Social Security in connection with a prior application for disability benefits. (Tr. 181, 710-16.)   Mr. Perkins was eighteen years old at the time. (Tr. 709.)  Dr. Lehman prepared a psychological report based on his examination of Mr. Perkins, his interview of Mr. Perkins's father, his administration of the Wechsler Adult Intelligence Scale III ("WAIS-III") test, and his review of the psychological evaluations of Dr. Bergman in 1995 and L.P. Moen in 2000. (Tr. 710-16.)

Mr. Perkins's father reported that Mr. Perkins was in special education and had an anger problem and a very low reading ability. (Tr. 710.)  He felt Mr. Perkins had difficulty comprehending things because he was exposed to alcohol and crack cocaine in the womb. (*Id.*) Mr. Perkins's father also reported that Mr. Perkins's older brother had committed suicide, and that Mr. Perkins: took Ritalin but it did not help; did almost no chores and had temper tantrums; constantly clashed with his sister; and served seventy-five days in juvenile detention for unruly behavior. (Tr. 710-11.)  Mr. Perkins was living with his father and sister. (Tr. 711.)

Mr. Perkins reported the following daily activities: he woke up and went to school by 7:30 a.m., after which he watched television or ran around outside; he went to sleep at about 11:00p.m.; he did not do chores, except occasionally some dishes (his father said he did not press him on chores because of his angry outbursts); he did not get along with his mother and got along with father "okay"; he had a couple of friends with whom he would hang out or smoke pot; and he smoked two or three cigarettes a day, alcohol on a rare basis, and was on Ritalin without

benefit.  (Tr. 711-12.)  He reported suicidal ideation, depression, low self-esteem, feeling worried at times, variable appetite, and social withdrawal without crying spells.  (Tr. 712.)

On examination, Mr. Perkins had "okay" hygiene and clean clothes, but his breath was "quite bad"; he reported brushing his teeth only "now and then."  (Tr. 712.)  He was relatively cooperative, behaved appropriately, showed animation and spontaneity, and had understandable speech.  (*Id.*)  His eye contact was good and his rapport was adequate, but his response time to questions was slow and he frequently repeated the question.  (*Id.*)  He understood most things said to him and was able to carry out a logical, goal-directed, coherent conversation, but with some mild slowing of his thinking.  (*Id.*)  He reported feeling angry and depressed.  (*Id.*)

Mr. Perkins appeared to have intact sensorium, and the results of both his new WAIS-III testing and his WISC-III testing from 2000 were in the mildly cognitively disabled range.  (Tr. 713.)  He put forth good effort on testing, and Dr. Lehmann believed the results to be a good estimate of his intellectual ability.  (*Id.*)  He was oriented to person, place, and time and "showed some remote and recent memory," with adequate immediate memory.  (*Id.*)  However, his general fund of knowledge was in the impaired range, his mental arithmetic ability was in the mildly impaired range, he had some difficulty interpreting common proverbs, and he showed a borderline ability to abstract similarities among common word pairs.  (*Id.*)  He had mildly impaired practical judgment and comprehension of the world.  (Tr. 714.)  He had an adequate ability to maintain concentration on a simple sequential task and had no obvious difficulty focusing his attention on the task at hand.  (*Id.*)  However, he lacked significant psychological self-awareness or insight into his then-current social or emotional functioning.  (*Id.*)

Based on WAIS-III testing, Dr. Lehmann found Mr. Perkins had an FSIQ of 63, which was in the first percentile and in the mildly cognitively disabled range.  (Tr. 713, 714.)  Because

his performance subtests were not significantly different from his verbal subtests, Dr. Lehmann found the results suggested a reliable test-taking administration; he also noted that the results were comparable to his testing results from 2000.  (Tr. 714.)  He therefore concluded that the results were an accurate representation of Mr. Perkins's then-current functioning.  (Tr. 713, 714.)

Dr. Lehmann diagnosed Mr. Perkins with: disruptive behavior disorder, not otherwise specified with oppositional and anger issues; cannabis abuse, active; and mild mental retardation with an FSIQ of 63.  (Tr. 715.)  With respect to his ability to perform work functions, Dr. Lehmann opined that Mr. Perkins lacked the ability to do any of the following:

- understand or remember job instructions effectively;

- respond appropriately to co-workers or job supervisors;

- withstand the routine stress or change of a regular workday; or

- independently manage any financial benefits for which he may be eligible.

(*Id.*).  Dr. Lehmann rated Mr. Perkins's prognosis as poor.  (*Id.*)

**James N. Spindler, M.S. – 2018 examination**

James N. Spindler, M.S., Psychologist, performed a consultative examination of Mr. Perkins at the request of Social Security on July 12, 2018.  (Tr. 694-99.)   Mr. Spindler reviewed a Report of Contact from SSA but did not review any other evidence in support of his evaluation. (Tr. 694).  He also did not perform any cognitive testing.  (Tr. 698.)  Mr. Spindler's report did not refer to any prior cognitive testing or Mr. Perkins's past disabled status. (Tr. 694-99.)

Mr. Perkins reported that he had been living at a homeless shelter for six months.  (Tr. 695.)  For activities of daily living, he reported getting out of bed by 5:00 a.m. and doing chores at the shelter, fishing or going to the beach with friends, riding his bike to visit friends, and occasionally going to church or for long walks.  (Tr. 698.)  He said he had no police record as a

teenager, was never hospitalized for psychiatric problems, and did not receive outpatient counseling as a child.  (Tr. 695, 696.)  He also reported that he was a high school graduate from a learning disorder program and had maintained a 3.00 grade average.  (Tr. 695.)  In school, he said he got along well with students and teachers but was suspended three times for fighting. (*Id.*)  He reported a very limited work history, but said he was always told he did good work and never had a problem getting along with supervisors or co-workers.  (Tr. 696.)  He reported occasional smoking and drinking, occasional marijuana use, but not for two years, and no prior use of other illicit drugs.  (Tr. 695.)

When asked what he felt prevented him from securing employment, he said, "My anger and my bipolar disorder," explaining: "When things don't go my way I blow up."  (Tr. 696.) When asked about his reported PTSD, he said he once saw a couple of dead bodies.  (*Id.*)  He also reported two past suicide attempts and sometimes hearing voices telling him to go places, but said he had never heard a voice telling him to harm himself or another person.  (*Id.*)

On examination, Mr. Perkins appeared to have adequate grooming, was cooperative, and appeared sober.  (Tr. 696.)  He spoke clearly, but his speech was a little pressured when he spoke of things that upset him.  (*Id.*)  He seemed impulsive and was easily distracted but was generally able to reattend without being prompted.  (*Id.*)  He had adequate thought associations, did not ramble, and provided coherent and relevant answers to questions.  (*Id.*)  His mood appeared angry, he was a little hyperactive, and he spoke rapidly and provided more information than the questions required.  (Tr. 697.)  He reported that his moods changed quickly, but that he was never physically aggressive.  (*Id.*)  He also reported that he worried a lot about bad things happening, but did not have problems going into the community on his own.  (*Id.*)

17

With respect to sensorium and cognitive functioning, Mr. Perkins: was alert and oriented; could recall five of five objects after five minutes; accurately recited five digits forward and two digits backward; knew the correct change from a ten-dollar bill for six dollars' worth of gasoline, counting on his fingers; and knew the current president.  (Tr. 697.)  Based on clinical observations, Mr. Spindler concluded that Mr. Ashford appeared to be functioning in the borderline range of intelligence as compared with others his age.  (*Id.*)  Mr. Spindler also concluded that Mr. Perkins had an adequate level of knowledge for most aspects of daily living, and that his judgment seemed reliable for most routine matters.  (Tr. 697, 699.)

Mr. Spindler diagnosed the following impairments: unspecified bipolar disorder with mood congruent psychological features; ADHD, combined presentation; Cannabis Use Disorder—in sustained remission; and Borderline Intellectual Functioning (BIF).  (Tr. 698.)

In assessing the reliability of Mr. Perkins' responses, Mr. Spindler observed: "claimant appears to have very little personal insight and may not be an entirely reliable reporter of his life and problems."  (Tr. 698.)  By way of example, Mr. Spindler noted: "Claimant reports that when he was employed her received good job performance ratings and had no major problem getting along with others [but] based on other things he told the examiner this self-assessment may not be entirely true."  (*Id.*)  Mr. Spindler additionally concluded that Mr. Perkins appeared to have the mental ability to manage his funds if he was granted benefits.  (Tr. 699.)

Mr. Spindler made the following assessments of Mr. Perkin's functional abilities:

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

Based on clinical observations, his use of language and reported educational background, [Mr. Perkins] appears to be functioning in the borderline range of intelligence.  He seems likely to have a problem understanding, remembering, and carrying out instructions in most job settings. However, he seems capable of managing a variety of unskilled, labor-type jobs.

18

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**

[Mr. Perkins] seemed impulsive and somewhat distracted during his interview.  He could recall five of five objects after five minutes and accurately recited five digits forward and two digits backward. Due, in part, to his ADHD, he seems likely to have a problem sustaining a working pace and maintaining a level of attention and concentration that would be sufficient for most job settings.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in the work setting.**

Claimant reports that when he was employed he received good job performance ratings and had no major problem getting along with others. Based on other things he told the examiner this self-assessment may not be entirely true.  He reports that he has problems getting along with other[s] due, in part, to his short temper and mood swings.   [Mr. Perkins] seems likely to have a problem responding appropriately to supervision and to coworkers.

**Describe claimant's abilities and limitations in responding appropriately to work pressures in a work setting.**

Based on clinical observations and what claimant told the examiner, he appears to be handling the current stressors in his life only moderately well at best.  [Mr. Perkins] seems likely to have a problem responding appropriately to routine work pressures.

(Tr. 699).

### iii.    State Agency Reviewers

On July 18, 2018, state agency psychological consultant Irma Johnston, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 135, 146-47) and mental RFC assessment (Tr. 136-38, 148-50).  In the PRT, she concluded that Mr. Perkins had moderate limitations in his ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage oneself.  (Tr. 135, 146-47.)  Dr. Johnson reviewed the medical evidence in the file at the time, which was limited to Mr. Spindler's consultative examination report.  (Tr. 134, 138, 146, 150.)  In the RFC, Dr. Johnston opined that Mr. Perkins could: understand, remember, and complete simple routine one-to-three

19

step tasks in an environment without frequent distraction or fast pace; interact occasionally with others on a superficial basis; and adapt to the environment without frequent changes or high production quotas, with major changes explained in advance.  (Tr. 137-38, 149-50.)

On reconsideration on October 6, 2018, state agency psychological consultant Aracelis Rivera, Psy.D., affirmed Dr. Johnson's PRT (Tr. 159-60, 170-71) and mental RFC findings (Tr. 161-63, 172-74).  Dr. Rivera reviewed the file as it was constituted at the time, which added Mr. Perkins's Nord treatment records through September 2018.  (Tr. 158-59, 169-70; *see* Tr. 613-58.)

**C.  Function Report**

Mr. Perkins discussed his daily activities with an SSA representative on May 10, 2018. (Tr. 482.)  He reported that he would "jump out the way and . . . have an attitude and . . . be enraged out of nowhere" when he was with friends and "something d[id]n't add up."  (*Id.*)  He also reported feeling bored, getting upset, and being depressed and anxious.  (*Id.*)  He wanted to be on medications, but had not been on medication since he was a juvenile and thought things had been going on too long to control the issues.  (*Id.*)  Mr. Perkins said he was "trying to be a level he [could] control and be around society."  (*Id.*)  He reported that he was able to hang out with friends and could make simple meals and manage money, but did not drive or have a driver's license.  (*Id.*)

**D.  Hearing Testimony**

**1.  Plaintiff's Testimony – 2019 Hearing**

At the hearing on November 1, 2019, Mr. Perkins testified before the ALJ.  (Tr. 81.)  He was represented by counsel.  (*Id.*)  In response to the ALJ's request for clarification regarding Mr. Perkins's prior disability status, counsel provided the following information:

- He was granted SSI in 2005;
- The medical records from his prior claim are in the current record;

- His prior disabled status was under Listing 12.05C;
- He was found to have a full scale IQ of 63 and disruptive behavior disorder; and,
- Those benefits continued until September 2017.

(Tr. 83-84.)  SSA's development of the file did not produce any decisions from Mr. Perkins's prior status, about which counsel stated: "I'm thinking there was not a formal decision at th[e] time [benefits ceased but i]nstead, what happened is Mr. Perkins relocated to Ohio."  (Tr. 84.) She continued, "[a]nd when he went into the [SSA] office in Ohio in March of 2018, they probably didn't have any information from Wisconsin, so they just took a new application from him.  And so, that's the SSI Application that's before you today."  (*Id.*)  Counsel argued that Mr. Perkins should qualify for disability based on his intellectual disability, difficulty with persistence and pace, and adaptive functioning, arguing that he demonstrated marked limitations in mental functioning.  (Tr. 87.)  If the ALJ was not willing to accept the existing cognitive testing in the record, counsel requested that new cognitive testing be performed.  (Tr. 85.)

Mr. Perkins was then questioned by the ALJ.  (Tr. 89-120.)  He told the ALJ that he had moved out of a homeless shelter and was in an apartment.  (Tr. 88-89.)  Regarding education, Mr. Perkins stated that he had a high school diploma and did not study after high school because he had needed to help his family around the house.  (Tr. 90.)  Asked why he had never had a driver's license, Mr. Perkins stated it was because he had doubted himself and was too busy worrying about everything else.  (Tr. 91.)  He reported spending time helping neighbors with walking dogs or furniture, sometimes for money.  (Tr. 92.)

The ALJ asked if he got "[b]enefits, assistance, anything?" as a form of income.  (Tr. 92.) Mr. Perkins answered no, but was corrected by counsel that he did receive food stamps and medical insurance; Mr. Perkins readily agreed with this correction.  (*Id.*)

21

Regarding paid employment, Mr. Perkins stated that his first "real" job was at Jackalope in 2019.  (Tr. 93.)  When the ALJ asked if it was full time, Mr. Perkins initially said yes, but on further questioning clarified that he actually worked more like 20 hours per week. (Tr. 93.)  He no longer worked at Jackalope because it was a seasonal restaurant.  (Tr. 94.)  But he stated that he would be starting a new dishwashing / table busing position soon.  (*Id.*)  He said he was always on time and never formally disciplined.  (Tr. 95.)

The ALJ asked why he had not had a paid job before these jobs.  (Tr. 100.)  Mr. Perkins responded that it was because he had not understood how to fill out a job application and because of his "dysfunctional [] attitude."  (*Id.*)  Asked what had changed, Mr. Perkins said he now knew how to talk to people with proper sense, common sense, and put his anger to the side.  (Tr. 101.)  The ALJ asked if treatment helped with this, and Mr. Perkins answered that, no, he got no treatment in Milwaukee and he made his own counseling, meditating.  (*Id.*)

For daily activities, Mr. Perkins reported that he bathed each morning and cleaned his home, grocery shopped at two stores he could walk to, and went to the library "to read and study stuff that [he didn't] know of."  (Tr. 102-03.)  He estimated spending ten hours a day at the library any day he was not working.  (Tr. 105.)  He also liked long walks, hanging out with friends, or walking to the beach.  (Tr. 106.)  The ALJ asked how much time he spent reading, and if there were particular genres or authors he enjoyed.  (*Id.*)  Mr. Perkins said he read about two hours a day and, no, he didn't have preferences and just "be grabbing books, like, him [l]et's see what this is about [and he']ll just read it for about an hour into it, to see what it's about."  (Tr. 106.)  He said he also kept in touch with family and had several friends.  (Tr. 106-07.)

Asked about references in the record to substance use, Mr. Perkins stated that he used marijuana and drank hard liquor.  (Tr. 108.)  He stated that he drank about twice a week but had

not had a drink since July.  (Tr. 108-09.)  Regarding marijuana, he agreed that he smoked one

blunt daily.  (Tr. 109.)  He said he had used crack cocaine in his "juvenile days" but not since

before he was twenty-two.  (Tr. 110.)

Counsel then examined Mr. Perkins.  (Tr. 110.)  Counsel asked Mr. Perkins if he had

been hired to do food prep at Jackalope, and he said he had but he did not catch on quickly so he

was moved to dishwashing.  (*Id.*)  He also admitted that he had to be reminded "sometimes

daily" to stay on task, and that sometimes he forgot he had to work.  (Tr. 111-12.)  Counsel

asked Mr. Perkins if he got help from his case manager, Tim Wright, LISW.  (Tr. 114.)  Mr.

Perkins said, yes, and that Mr. Wright brought him to the hearing that day, also took him to

doctors' appointments, and filled out job applications on his behalf.  (Tr. 115.)  Mr. Perkins also

agreed that Mr. Wright helped him get his medication, find transportation, obtain food stamps,

and manage workplace conflict.  (Tr. 115-119.)

### 2.      Plaintiff's Testimony – 2021 Hearing

Following the Appeals Council's remand order, Mr. Perkins's second hearing was held

via telephonic conference on April 7, 2019.  (Tr. 34-78.)   Mr. Perkins was represented by

counsel.  (Tr. 37.)  He confirmed that he still lived independently in the same apartment, and

confirmed his education history and lack of driver's license.  (Tr. 42-44.)  Mr. Perkins told the

ALJ that had recently got a DUI which resulted in his driver's license being suspended.  (Tr. 44.)

The ALJ expressed a lack of understanding as to how he could have a license suspended if he did

not have a license.  (Tr. 44-45.)  Mr. Perkins answered at length, including that he was in jail for

two days over the DUI after missing court, eventually stating: "So, the judge told me that, well, I

had said that I had no license, which is, he already knew.  And he was like, well your license will

23

be taken away due to the fact that you don't have a license, and you were driving under the influence." (Tr. 45-46.)  Mr. Perkins stated that he owed $475.00 in fines for the DUI.  (Tr. 46.)

Mr. Perkins stated that he no longer did "volunteer work" like helping neighbors with lawn work, dog walking, or moving furniture.  (Tr. 47.)  He confirmed that he was single, had medical insurance, and received food stamps.  (Tr. 48.)

The ALJ talked to Mr. Perkins about his employment history.  (Tr. 48-57.)  Mr. Perkins stated that his last job was as a dishwasher at Wood & Wine, and Spectrum Catering before that. (Tr. 48.)  He stated that he worked for Wood & Wine until March 2021.  (Tr. 48-49; *but see* Tr. 871 (November 30, 2020 Catholic Charity session notes in which Mr. Perkins stated that he was laid off due to performance issues including being slow) and Tr. 463-65 (no 2021 earnings).)

Regarding job performance, Mr. Perkins told the ALJ that he would get sidetracked at Wood & Wine, doing tasks he was not asked to do.  (Tr. 49-50.)  He had trouble with a co-worker who had "bad energy," but would accept a job back there if it were still open.  (Tr. 49-52.)  Mr. Perkins did have trouble with transportation because he did not drive; he had to pay a co-worker to drive him, but felt the cost was unfair.  (Tr. 52-53.)  His assistant manager learned about his transportation issues and helped him navigate the situation and also began driving him to work.  (Tr. 53-54.)  He discussed a willingness to work as a dishwasher and mixed feelings about working with people because of anger issues or dealing with conflict.  (Tr. 55-57.)

Mr. Perkins confirmed that he continued to keep his apartment clean, did his own shopping and laundry, and took walks to see friends, but reported being mostly a homebody. (Tr. 57-60.)  With friends, Mr. Perkins said he would play basketball or hang out in the neighborhood, and that his friends might drink alcohol or smoke marijuana but that he slowed down on marijuana due to drug testing.  (Tr. 60-61.)  He would go see his case worker to help fill

24

out applications, and check on his application status with the businesses. (Tr. 61-62.) The ALJ asked if he still went to the library, reminding Mr. Perkins that he said in the 2019 Hearing that he would read books and borrow movies, usually from 10 a.m. until 8 p.m. (Tr. 62.) He said he stopped going when it closed for Covid-19, and had since misplaced his library card. (Tr. 62-63.) He said he read on his phone and still took walks. (Tr. 63.)

The ALJ asked whether Mr. Perkins was still drinking hard alcohol, as he reported in 2019, to which he replied that he quit drinking. (Tr. 64.) The ALJ asked when the last time he drank was, and Mr. Perkins answered: "Since I just quit." (Tr. 64.) He said he might drink every six months and that he might smoke marijuana every Friday, but that he was trying to be sober. (Tr. 65.) Mr. Perkins stated that he still had not used crack cocaine or other hard drugs for about thirteen years. (Tr. 66.)

Counsel then examined Mr. Perkins. (Tr. 67-71.) Mr. Perkins confirmed to counsel that he was let go from Wood & Wine for performance and attendance issues, and that his assistant manager helped him stay on task. (Tr. 67-68.) Regarding assistance from LISW Wright with Catholic Charities, Mr. Perkins stated that LISW Wright helps him understand paperwork, manage his money, get transportation, and make medical appointments. (Tr. 69-71.) He also confirmed that he was in special education in high school. (Tr. 72.)

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified. (Tr. 74.) The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience with the functional limitations described in the ALJ's RFC determination could perform representative positions in the national economy, including machine operator, kitchen helper, or industrial cleaner. (*Id.*)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

With respect to CIB, an adult whose parent is entitled to old age or disability benefits can receive CIB if the "child was under a disability ... at the time [s]he attained the age of 18 or . . . or prior to the time he attained . . . the age of 22."  42 U.S.C. § 402(d)(1)(G); *see* 20 C.F.R. § 404.350(a)(5); *Jones v. Sec'y of Health & Human Servs.*, 89–1603, 1990 WL 17265, at * 1 n.1 (6th Cir. Feb. 27, 1990) (Section 402(d) "provides that a child of an individual entitled to old age or disability insurance benefits is entitled to Child's Insurance Benefits if [s]he is under a disability (as defined by section 223(d) of the Social Security Act) which began before h[er] twenty-second birthday."

## IV.    The ALJ's Decision

In her May 11, 2001 decision, the ALJ made the following findings:[2]

1.    The claimant had not attained age 22 as of June[sic] 12, 2005, the claimant's birthday.  (Tr. 23.)

2.    The claimant has not engaged in substantial gainful activity since July 12, 2005, the claimant's eighteenth birthday.  (*Id.*)

3.    The claimant has the following severe impairments: depression, bipolar disorder, borderline intellectual functioning, attention-deficit/hyperactivity disorder.  (*Id.*)

---

[2] The ALJ's findings are summarized.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 24.)

5. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to the performance of simple, routine tasks that are not performed at a production-rate pace. He can have occasional interaction with supervisors, co-workers, and the public. He is limited to occasional, routine workplace changes. (Tr. 27.)

6. The claimant has no past relevant work. (Tr. 30.)

7. The claimant was born in 1987 and was 18 years old, defined as a younger individual age 18-49, on his eighteenth birthday. (*Id.*)

8. The claimant has at least a high school education. (*Id.*)

9. Transferability of job skills is not material to the determination of disability. (*Id.*)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including: machine feeder, kitchen helper, and industrial cleaner. (Tr. 31.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 12, 2005, through the date of the decision on May 11, 2021. (Tr. 21.)

## V.    Plaintiff's Arguments

Mr. Perkins alleges three assignments of error: (1) the ALJ's evaluation of his intellectual disorder was not supported by substantial evidence because the ALJ ignored relevant evidence in the record relating to his IQ and his prior disability based on Listing 12.05; (2) the ALJ failed to comply with 20 C.F.R. 404.1520c/416.920c when she evaluated the medical opinions on record because she failed to mention certain medical opinions and failed to properly explain supportability and consistency related to other medical opinions; and (3) the RFC was not

supported by substantial evidence because the ALJ failed to comply with SSR 96-8p and SSR 85-16 when she evaluated the limiting effects of Mr. Perkins's mental impairments on his ability to perform work-like activities.  (ECF Doc. 10, 12.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

29

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached

by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit

has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

The Court addresses Mr. Perkins's three assignments of error out of turn, finding merit to

his second assignment of error as it relates to the evaluation of medical opinions from

consultative psychological examiners Dr. Lehmann and Mr. Spindler.

**B.**     **Second Assignment of Error: Whether ALJ Properly Evaluated Persuasiveness of
           Consultative Examiner Medical Opinions**

In his second assignment of error, Mr. Perkins argues that the ALJ failed to properly

evaluate the persuasiveness of the opinions of consultative psychological examiners Dr.

Lehmann and Mr. Spindler.[3]  (ECF Doc. 10, pp. 18-19.)  The Commissioner argues in response

---

[3] Mr. Perkins also argues that the ALJ erred in failing to assess the persuasiveness of L.P. Moen's 2000 psychological evaluation (Tr. 704-09) and the opinions of state agency psychological consultants Margaret Getman, Ph.D., (Tr. 180) and Jack Spear, Ph.D., (Tr. 181, 717-18) who evaluated the evidence submitted in support of Mr. Perkins' disability applications in 2000 and 2006 (ECF Doc. 10, pp. 18-19), and further that the ALJ erred in her assessment of the 2018 opinions of state agency psychological consultants Drs. Johnson and Rivera (*id.* at pp. 20-

30

that the ALJ appropriately considered both opinions and adequately explained the bases for her persuasiveness findings.  (ECF Doc. 11, pp. 17-19.)  For the reasons set forth below, the Court finds that the ALJ failed to appropriately and accurately articulate her reasons for finding the consultative examiners' opinions unpersuasive and failed to build a logical bridge between the evidence and the result, warranting remand of the decision.

### 1.    Legal Framework for Evaluating Medical Opinions

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec*., No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

---

21).  Because remand is warranted based on the ALJ's erroneous assessment of the consultative psychological opinions of Dr. Lehmann and Mr. Spindler, the Court need not address these arguments.  Any subsequent disability determination should evaluate the medical evidence in a manner that satisfies the regulatory framework.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with evidence from other medical and nonmedical sources in the record.

### 2. Whether the ALJ Properly Evaluated the 2006 Opinion of Dr. Lehmann

The ALJ evaluated the persuasiveness of Dr. Lehmann's opinion as follows:

I note that the claimant underwent a psychological evaluation [with Dr. Lehmann] on February 15, 2006 at which time the claimant reported using alcohol and smoking marijuana frequently. He was administered standardized intelligence testing on which he scored significantly below average. However, he was also to perform simple calculations, demonstrated adequate immediate memory, and was able to maintain attention and concentration for simple tasks. The assessment included cannabis abuse. This evaluator felt that the claimant's prognosis was poor and that he was incapable of understanding and remembering job instructions, incapable of responding appropriately to co-workers and supervisors, incapable of being able to withstand the routine stress or change of a regular workday, and had a below average ability to maintain attention and concentration on even uncomplicated tasks []. I find this opinion of this examiner generally not persuasive as it is supported only by a single examination of the claimant and based, in part, on the subjective reporting of symptoms by the claimant. In addition, the claimant reported a significant usage of marijuana during this evaluation and also testified to using other illicit drugs, including crack cocaine in the past during the hearing (Hearing Testimony). In addition, this opinion is not supported by the other longitudinal medical evidence that documents generally normal mental status findings and is not consistent with the claimant's high level of reported activity as discussed herein. This consultative examination provides support for the inclusion of the above-defined non-exertional limitations in the formulation of the claimant's residual functional capacity, but does not support a finding that the claimant requires any additional limitations beyond those contained in the above residual functional capacity.

(Tr. 19-20 (citation omitted) (emphasis added).)

Mr. Perkins argues that the ALJ failed to properly evaluate the persuasiveness of Dr. Lehmann's opinion because one of her stated reasons for finding the opinion "generally not persuasive"—that it was supported only by a single examination and based, in part, on Mr. Perkins' subjective symptom reports—ignores the fact that the opinion was also supported by cognitive testing and the opinions of Dr. Spear and L.P. Moen.  (ECF Doc. 10, pp. 19-20.)  Mr. Perkins also disagrees with the ALJ's finding that the longitudinal evidence does not support the opinion, highlighting evidence of his difficulty navigating community resources.  (*Id.* at p. 20.)

In considering the "supportability" factor, the Court finds the ALJ did not accurately characterize the record when she found that Dr. Lehmann's opinion was "supported only by a single examination of the claimant."  (Tr. 20.)  In fact, Dr. Lehmann specified that his findings were based not only on his clinical examination of Mr. Perkins, but also on: (a) his review of prior psychological reports from 1995 and 2000, both with cognitive testing; and (b) new WAIS-III cognitive testing results that Dr. Lehmann found to be both reliable and comparable to prior cognitive testing in 2000. (Tr. 710-15.)

The regulations establish that an opinion is more persuasive when "the objective medical evidence and supporting explanations presented by a medical source" are more relevant to the opinion.  20 C.F.R. § 404.1520c(c)(1).  Here, Dr. Lehmann based his opinion in part on cognitive testing he conducted, which he found supported a diagnosis of mild mental retardation with an FSIQ of 63.  (Tr. 715.)  He observed "relatively little scatter among individual subtest[s]," which he found suggested "a fairly reliable test-taking administration."  (Tr. 714.)  He also observed that his own cognitive testing results were "comparable to" L.P. Moen's cognitive test findings in 2000—findings that he had personally reviewed—and concluded that the new test findings were thus "believable levels of [Mr. Perkins'] current ability."  (Tr. 710, 714.)  L.P. Moen had

similarly concluded that an FSIQ score of 55 was a valid indicator of Mr. Perkins' general intellectual ability because his subtest scores did not differ significantly.  (Tr. 707.)  By finding Dr. Lehmann's opinion was "supported only by a single examination" of Mr. Perkins, the ALJ failed to accurately characterize the objective medical evidence relied upon by Dr. Lehmann.

This failure is not cured by the ALJ's separate acknowledgement that Mr. Perkins "was administered standardized intelligence testing on which he scored significantly below average." (Tr. 19-20.)  First, the phrase "significantly below average" does not clearly address the specific degree of limitation suggested by an FSIQ of 63.  Second, the ALJ went on to contrast the cognitive test findings with certain clinical examination findings—ostensibly to suggest that the testing may have overstated Mr. Perkins limitations—without also acknowledging the objective medical evidence Dr. Lehmann found to be supportive of the test findings, including Mr. Perkins' good effort on the test, the limited scatter among subtests, and the comparable results obtained in L.P. Moen's earlier cognitive testing.  (Tr. 713-14.)

The Commissioner's additional argument that Mr. Perkins' "IQ was not directly relevant to the ALJ's analysis" also lacks merit.  (ECF Doc. 11, pp. 18-19.)  While the Commissioner is correct that an FSIQ of 63 *alone* is insufficient to meet Listing 12.05B because there must also be a finding of marked or extreme limitations in mental functioning (*id.* at p. 16), the question before this Court is whether the ALJ sufficiently articulated her reasons for finding a medical opinion not persuasive—an opinion that had found Mr. Perkins lacked the ability to: understand or remember job instructions effectively; respond appropriately to co-workers or job supervisors; and to withstand the routine stress or change of a regular workday (Tr. 715).  Certainly, such limitations, if found persuasive, could support a finding of marked or extreme limitations in functioning as necessary to meet Listing 12.05B.

34

By failing to fully and accurately acknowledge that Dr. Lehman based his opinion in part on cognitive testing—both by himself and earlier providers—which testing was itself supported by specific indicia of reliability, the ALJ failed to sufficiently articulate her reasons for finding Dr. Lehmann's opinion unpersuasive and failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Although the above failing with respect to the "supportability" analysis is sufficient to warrant remand of the decision, the Court will also briefly address the "consistency" analysis. The regulations provide that an opinion is more persuasive when it is more consistent with "evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2). Here, the ALJ found in part that Dr. Lehmann's opinion was "not consistent with the claimant's high level of reported activity as discussed herein" (Tr. 20), without acknowledging or addressing Dr. Lehmann's finding that Mr. Perkins "lack[ed] significant psychological self-awareness or insight into his current social or emotional functioning." (Tr. 714.) By relying on Mr. Perkins' self-reported functioning to discount the persuasiveness of Dr. Lehmann's opinion, without addressing Dr. Lehmann's finding that Mr. Perkins lacked significant insight into his own functioning, the ALJ again failed to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

For the stated reasons, the Court finds that the ALJ's analysis of the persuasiveness of Dr. Lehmann's opinion amounted to reversible error warranting remand.

### 3.     Whether the ALJ Properly Evaluated the 2018 Opinion of Mr. Spindler

The ALJ evaluated the persuasiveness of Mr. Spindler's 2018 psychological consultative examination report as follows:

> The claimant underwent a psychological consultative examination performed by James N. Spindler, M.S. on July 12, 2018. At this time, the claimant reported he

had graduated high school and that he was currently residing in a shelter. In terms of activities of daily living, the claimant reported helping with chores at the shelter and that he enjoyed going to the beach and fishing. He also reported riding a bicycle and spending time with friends. He reported occasionally using alcohol and that he had previously smoked marijuana. On mental status exam, the claimant was noted to be angry and hyperactive. He also reported feeling anxious. He also reported a history of mood swings. He was oriented to place and person and was able to recall 5/5 objects after a short delay. He was also able to recite five digits forward and two digits backward. He was able to correctly calculate the amount of change during a transaction and knew the name of the current U.S. President. It was felt that his intelligence was in the borderline range, but that he had he had adequate knowledge for most aspects of daily living. Following this exam, the assessment included bipolar disorder, attention-deficit/hyperactivity disorder (ADHD), combined presentation, and borderline intellectual functioning. It was felt that the claimant could perform unskilled work, but that he would likely have difficulty maintaining attention and concentration, responding appropriately to supervision and coworkers, and in responding appropriately to routine work pressures []. <u>I find these opinions only somewhat persuasive as they are supported only by a single examination of the claimant and based, in part, on the subjective reporting of symptoms by the claimant</u>. However, <u>to the extent that such limitations are consistent with the other longitudinal medical evidence of record documenting generally normal and stable mental status findings as well as with the claimant's reported level of activity, I find that this consultative examination provides support for the inclusion of the above-defined non-exertional limitations</u> in the formulation of the claimant's residual functional capacity, but does not support a finding that the claimant requires any additional limitations beyond those contained in the above residual functional capacity.

(Tr. 24 (citations omitted) (emphasis added).)

The ALJ's stated reasons for finding Mr. Spindler's opinion "only somewhat persuasive" mirror her reasons for discounting the earlier consultative examination by Dr. Lehmann—i.e., that the opinion was supported "only by a single examination" and was based in part on Mr. Perkins' subjective reporting of symptoms. However, the ALJ's observation that Mr. Spindler's opinion was "supported only by a single examination" of Mr. Perkins (Tr. 24) is accurate in this instance because—unlike Dr. Lehmann—Mr. Spindler was not provided copies of earlier

psychiatric evaluations or cognitive testing prior to the examination (Tr. 694) and was not asked to complete any new cognitive testing (Tr. 698).

Mr. Perkins argues that the ALJ's stated grounds for discounting Mr. Spindler's opinion were insufficient "especially because the ALJ failed to consider its consistency . . . with the other medical opinions of record."  (ECF Doc. 10, p. 20.)  Generally, an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006)).  Nevertheless, her explanation should "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Here, a consultative psychological examination was ordered for a person who had previously received disability benefits for seventeen years based on a primary diagnosis of mental retardation.  (Tr. 180, 181, 207.)  The examiner was not advised of the prior diagnosis or receipt of benefits, was not provided copies of prior cognitive testing supporting diagnoses of mild mental retardation, and was not instructed to conduct new cognitive testing.  (Tr. 694-99.)  Based on a clinical examination alone—which is all the examiner was instructed to complete— the examiner determined that Mr. Perkins "appear[ed] to be functioning in the borderline range of intelligence" and "appear[ed] to have very little personal insight" such that he "may not be an entirely reliable reporter of his life and problems." (Tr. 698.)  The examiner therefore opined that his self-reported ability to respond appropriately to supervision and coworkers did not appear true, and that he "seem[ed] likely to have a problem responding appropriately" to supervision, coworkers, and routine work pressures.  (Tr. 699.)  The examiner also opined that

Mr. Perkins "seem[ed] likely to have a problem sustaining a working pace and to maintain a level of attention and concentration that would be sufficient for most job settings." (*Id.*)

In discounting the potentially disabling findings in Mr. Spindler's opinion, the ALJ observed that the opinion was "based, in part, on the subjective reporting of symptoms by the claimant." (Tr. 24.) But she did not specify which subjective reports she found Mr. Spindler improperly relied on in finding greater limitations than those supported by clinical examination. Further, the ALJ went on to find that RFC limitations based on Mr. Spindler's opinion were appropriate *only* to the extent that they were also consistent with Mr. Perkins's "reported level of activity," without acknowledging or addressing Mr. Spindler's finding—like Dr. Lehmann's similar finding, discussed above—that Mr. Perkins "appears to have very little personal insight and may not be an entirely reliable reporter of his life and problems." (Tr. 698.)

The self-reported information referenced by Mr. Spindler in support of his functional opinions concerned Mr. Perkins's educational background and work experience. (Tr. 699.) As to education, Mr. Perkins reported graduating high school in a learning-disabled program with good attendance and a 3.0 grade point average, but with three suspensions for fighting. (Tr. 695.) If anything, the record suggests Mr. Perkins under-reported his prior difficulties and limitations in the school setting. (*See, e.g.,* Tr. 519-574.) As to his functioning in a work setting, Mr. Perkins—then 30 years old—reported a work history limited to a paper route at age 11 to 12, taking care of his grandfather for a while, and cutting the lawn for his father, with no prior vocational rehabilitation assistance. (Tr. 696.) The record is consistent with this reported lack of work history. (*See, e.g.,* Tr. 463, 464-65.) It was only within these "limited work experiences" that Mr. Perkins reported always being told he did good work and never having a problem getting along with supervisors or coworkers. (*Id.*) But he also reported he was not working

because: "When things don't go my way I blow up."  (*Id.*)  The record is also consistent with his reported history of anger and related outbursts.  (*See, e.g.,* Tr. 619, 633, 704, 710-11.)

The Court finds that the ALJ failed to sufficiently articulate her reasons for finding Mr. Spindler's opinion "only somewhat persuasive" and failed to build an accurate and logical bridge between the evidence and the result.  She discounted the opinion in part because it was based on subjective reports, without any clear indication as to what subjective reports she believed had overstated Mr. Perkins's limitation.  As noted above, the subjective reports referenced by Mr. Spindler—regarding Mr. Perkins's educational background and work experience—do not appear to have overstated his limitations.  Then—somewhat contrarily—the ALJ went on to discount the opinion to the extent that it called for limitations greater than Mr. Perkins's "[self-]reported level of activity," without addressing Mr. Spindler's finding that Mr. Perkins appeared to have "very little personal insight" and "m[ight] not be an entirely reliable reporter of his life and problems." (Tr. 698.)  In other words, the ALJ found Mr. Spindler improperly relied on self-reported limitations which do not appear to have been over-reported, and then found Mr. Spindler's opinion unpersuasive to the extent that Mr. Perkins reported a greater level of activity, without addressing Mr. Spindler's observation that he had very little personal insight and may not be a reliable reporter.  This explanation failed to sufficiently articulate the ALJ's reasoning and failed to build a logical bridge between the evidence and the ALJ's persuasiveness finding.

The ALJ's additional observation that the opinion was "supported by only a single examination" does not salvage her analysis.  It was within her discretion to order cognitive testing or to provide copies of prior psychiatric examination reports or testing to Mr. Spindler, as was done for Dr. Lehmann.  *See* 20 C.F.R. § 404.1519a(b) (providing that a consultative examination may be appropriate "to secure needed medical evidence, such as clinical findings,

laboratory tests, a diagnosis, or prognosis").  Indeed, Mr. Perkins's counsel explicitly requested
that the ALJ order new cognitive testing if she did not accept the dated cognitive testing in the
record.  (Tr. 85.)  The ALJ's decision to discount Mr. Spindler's findings as based only on a
clinical examination and self-report—while at the same time declining to exercise available
discretion to permit him to consider prior or new cognitive testing—further deprives the ALJ's
analysis of an accurate and logical bridge between the evidence and the result.

 For the reasons stated above, the Court finds that the ALJ's analysis of the persuasiveness
of Mr. Spindler's opinion amounted to reversible error warranting remand.

## C. First and Third Assignments of Error Need Not be Addressed

 In his first assignment of error, Mr. Perkins alleges that the ALJ's evaluation of his
intellectual disorder was improper because: (1) it did not incorporate evidence in the record that
could establish Listing 12.05 criteria; and (2) the ALJ's failure to obtain cognitive testing was
reversible error because the ALJ refused to accept other IQ evidence and counsel requested
cognitive testing if prior evidence were not accepted.  (ECF Doc. 10, p. 13, 17.)

 In his third assignment of error, Mr. Perkins asserts that the ALJ failed to set forth a
function-by-function assessment of his ability to do work-related activities based on all of the
relevant evidence under SSR 96-8p, failed to abide by Social Security Ruling 85-16 when she
did not draw meaningful inferences and allow reasonable conclusions about his strengths and
weaknesses, and improperly failed to discuss certain medical opinions and prior administrative
findings.  (ECF Doc. 10, pp. 22-23; ECF Doc. 12, p. 8.)

 The Court does not reach a conclusion based on the arguments in the first or third
assignments of error.  Nevertheless, it is expected that the ALJ will newly and appropriately

address all evidence relevant to the Listings analysis and the assessment of Mr. Perkins's

subjective symptom reports in any subsequent disability determination.

### VII.    Conclusion

For the foregoing reasons, the Court **VACATES and REMANDS** the Commissioner's

decision for further proceedings consistent with this opinion and order.  On remand, the ALJ

shall clearly and accurately articulate her findings as to the persuasiveness of the consultative

opinions of Dr. Lehmann and Mr. Spindler, and other relevant medical opinions, specifically

acknowledging and accurately characterizing any cognitive testing considered and appropriately

explaining how she considered both the supportability and the consistency of the opinions.  The

ALJ should also ensure that her decision complies with the governing regulatory framework and

builds an accurate and logical bridge between the evidence and result.


April 15, 2024


*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge